**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **WILLIE DUMAS o/b/o D.D.,** | ) | **CASE NO. 1:09CV2493** |
| **Plaintiff,** | ) | |
| v. | ) | **MAGISTRATE JUDGE GREG WHITE** |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| **Defendant.** | ) | **MEMORANDUM OPINION & ORDER** |

Plaintiff, Willie Mae Dumas ("Dumas"), on behalf of her grandson, D.D., challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying the claim for Supplemental Social Security under Title XVI of the Social Security Act ("Act"), 42 U.S.C. § 1381, 20 C.F.R. § 416.924a.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  The case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).

For the reasons set forth below, the decision of the Commissioner is affirmed.

### I. Procedural History

On June 12, 2006, Dumas filed an application for SSI benefits on behalf of D.D., a school-age child, due to learning disorders.  The application was denied both initially and upon reconsideration.  Dumas timely requested an administrative hearing.

On December 4, 2008, a video teleconference hearing was held before an Administrative Law Judge ("ALJ") from Falls Church, Virginia, while Dumas and D.D. appeared from Cleveland, Ohio.  On January 27, 2009, the ALJ found that D.D. did not have an impairment or combination of impairments that met, medically equaled, or functionally equaled an impairment listed in Appendix 1.  He concluded, therefore, that D.D. was not under a disability.  (Doc. No.

12-2 at 4-12.)

Dumas challenges the decision of the Commissioner on the ground that finding D.D.'s impairments did not functionally equal a listing is unsupported by substantial evidence.

## II. Evidence

D.D., born on August 11, 1998, was seven years old and had completed the second grade when his application was filed. (Tr. 124, 130.)

On January 23, 2006, his second grade teacher referred seven-year old D.D. for an evaluation as he was performing below grade level in reading, his writing was illegible, and he had difficulty paying attention and staying focused. (Tr. 180.) Based upon testing results, school officials found D.D. had "low average" word reading, math reasoning, spelling, and written expression skills. (Tr. 183.) School officials also administered the Wechsler Intelligence Scale for Children-IV ("WISC-IV"). (Tr. 184-185.) He was assessed with composite scores of 98 in verbal comprehension, 94 in perceptual reasoning, 99 in working memory, and 97 in processing speed. (Tr. 184.) IQ testing revealed a full scale IQ of 96. (Tr. 184.) The school concluded that D.D. qualified for special education services as he had resisted interventions in the regular classroom and "a discrepancy was identified in the areas of reading comprehension and math computation." (Tr. 192.)

On February 3, 2006, an Individualized Education Program ("IEP") was prepared for D.D., which provided him weekly extra instruction time and small group instruction as part of his regular education. (Tr. 157-168.) The IEP noted that D.D. suffered from an education disability that adversely impacted his number, number sense, operation, writing convention, reading process, phonemic awareness, measurements, and applied writing abilities. (Tr. 157-159.) It further noted that Dumas was to follow-up with a doctor to determine if D.D. suffered from Attention Deficit-Hyperactivity Disorder ("ADHD"). (Tr. 193.)

On June 6, 2006, D.D.'s school evaluated his progress and concluded that he had mastered his IEP goals, except for writing conventions, a category he was "close to mastering." (Tr. 175-178.)

On June 8, 2006, a pediatric neurologist at University Hospital, Susan K. Klein, Ph.D.,

2

diagnosed D.D. with Attention Deficit Disorder ("ADD") and a reading disorder. (Tr. 230-231.) She prescribed Adderall. *Id.*

On August 29, 2006, a psychologist, David V. House, Ph.D., completed a consultative evaluation for the state agency after performing clinical interviews, reviewing background information and administering psychological tests. (Tr. 372.) He noted that D.D. had recently entered the third grade, and had "some special assistance but [was] not directly in special education." (Tr. 374.) He observed that D.D.'s concentration and attention were deficient, and that he was very restless and fidgety. (Tr. 375.) The doctor further noted that D.D. was persistent in trying to complete assigned tasks and he was generally cooperative. *Id.* The record reflects that D.D. had not taken his Adderall that day. (Tr. 374.) Dr. House also noted that D.D. "spoke in complete sentences that appeared to agree generally with his age and educational expectations." (Tr. 375.)

Dr. House administered the WISC-IV and the Wide Range Achievement Test-IV ("WRAT-IV"). (Tr. 375-376.) In the four sub-tests of the WISC-IV, Dr. House assessed D.D. with composite scores of 100 in verbal comprehension, 90 in perceptual reasoning, 74 in working memory, and 97 in processing speed. (Tr. 375.) Overall, Dr. House assessed D.D.'s full scale IQ as 86, which is in the "low average to average range." (Tr. 376.) In the five sub-tests of the WRAT-IV, Dr. House assessed D.D. with standard scores of 81 in word reading, 71 in sentence completion, 69 in spelling, 87 in math computation, and 74 in reading composite, all below his then-current grade level. (Tr. 376-377.) Dr. House stated that D.D. appears to demonstrate "some learning difficulties, primarily in reading sentence comprehension and in spelling." (Tr. 377.) He set D.D.'s Global Assessment of Functioning ("GAF") score as 53.[1] (Tr. 378.)

---

[1] A GAF score between 51 and 60 indicates the presence of "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (*e.g*., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

On September 20, 2006, a state agency psychologist, Carol Lewin, Ph.D., completed an assessment of D.D.'s limitations in six different domains, as required by the Social Security Regulations when determining a child's functioning. (Tr. 214-216.) Dr. Lewin found that D.D. had a marked limitation in the domain of attending and completing tasks. (Tr. 215.) She found less-than-marked limitations in the domains of acquiring and using information; interacting and relating with others; and, moving about and manipulating objects. (Tr. 215-216.) In the domains of caring for yourself and health and physical well-being, Dr. Lewin found no limitations. (Tr. 216.)

On October 3, 2006, D.D. returned to Dr. Klein. (Tr. 232-233.) She noted that he was in the third grade and functioning under an IEP. (Tr. 232.) She further noted that he "made good eye contact and spoke in full sentences." *Id*. Dr. Klein described the Adderall dosage as "perfect." *Id.* She remarked that Dumas had "gotten everything in good order" and that D.D. "will do very well." *Id*.

On December 20, 2006, a second state agency examiner, Vicki Casterline, Ph.D., provided her assessment of D.D.'s limitations in the six domains based on a review of the record. (Tr. 242-246.) Dr. Casterline noted that the WISC-IV score results show D.D.'s "overall cognitive ability is within the average range when compared with other students his age." (Tr. 243-244.) She also noted that he "seem[ed] to be getting better with treatment." *Id*. She found the same limitations as reported by Dr. Lewin, with the exception that, in the domain of attending and completing tasks, Dr. Casterline found that D.D. had a less-than-marked limitation. *Id*.

In May 2007, D.D. saw pediatrician Michael Dell, M.D., who noted D.D. was well appearing, in no distress, and cooperative. (Tr. 368.) His Adderall prescription was refilled. *Id.*

In October 2007, another pediatrician, Laura Caserta, M.D., examined D.D. and noted that he was alert and "well-appearing." (Tr. 367.) She discussed his weight and refilled his Adderall, but made no other recommendations. *Id*. In February 2008, Dr. Caserta treated D.D. for a viral illness, and noted that his behavior was "slightly" worse at school. (Tr. 366.)

In February 2008, when D.D. was in the fourth grade, his updated IEP, effective February

4

1, 2008, noted that the results from the Star Math Test showed he was working at the third month of the third grade level. (Tr. 350.) The IEP also noted that D.D. had mastered four out of the five goals of his previous IEP. (Tr. 348-349.) The goal not mastered related to D.D.'s ability to demonstrate the English language by reading books at "his independent reading level 3 to 4 times per week with at least 80% accuracy . . . ." (Tr. 348.) D.D., however, met his other goals, including knowledge of multiplication facts, 89% accuracy; addition and subtraction, 80.3% accuracy; and writing, 75% accuracy. (Tr. 348-350.)

In August 2008, Dr. Caserta performed an examination, and noted that D.D. was "doing well" and "did well [the] last year." (Tr. 365.)

On October 22, 2008, Darlene Quinones, an intervention specialist at the school, provided a behavior report. (Tr. 170.) She noted that D.D. was in a class for children with special needs and received small group instruction in all academic areas. *Id.* She further reported that he was responsive during small group instruction, but had trouble remaining focused in regular classes. *Id*. Although he completed his in-class assignments, he usually did not do homework. *Id*. He had a difficult time with peer interaction, and was often verbally and physically aggressive. *Id*.

### Hearing Testimony

At the hearing on December 4, 2008, Dumas testified to the following:

- D.D. was ten years old and in the fourth grade. (Tr. 24.)
- He was repeating the fourth grade due to a learning disability, which was the first time he was held back a grade. *Id*.
- He takes Adderall, which helps in some ways, but in most of the ways, it does not, as he has problems moving, talking, and not focusing. (Tr. 24-25.)
- He was suspended from school four to five different times in third grade due to his hyperactivity, fidgetiness, and inability to focus. (Tr. 25-26.)
- His grades in reading and writing were not good, but math was okay. (Tr. 26.)
- He has bed-wetting issues and sleepwalks about two times each week. (Tr. 26-27.)

### III. Standard for Disability

To qualify for SSI benefits, an individual must demonstrate a disability as defined under

the Act. "An individual under the age of 18 shall be considered disabled . . . if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C).

To determine whether a child is disabled, the regulations prescribe a three-step sequential evaluation process. 20 C.F.R. § 416.924(a). At step one, a child must not be engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). At step two, a child must suffer from a "severe impairment." 20 C.F.R. § 416.924(c). At step three, disability will be found if a child has an impairment, or combination of impairments, that meets, medically equals or functionally equals an impairment listed in 20 C.F.R. § 404, Subpt. P, App'x 1; 20 C.F.R. § 416.924(d).

To determine whether a child's impairment functionally equals the listings, the Commissioner will assess the functional limitations caused by the impairment. 20 C.F.R. § 416.926a(a). The Commissioner will consider how a child functions in six domains: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for [ ]self; and (6) health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i)-(vi). If a child's impairment results in "marked" limitations in two domains, or an "extreme" limitation in one domain, the impairments functionally equal the listings and the child will be found disabled. 20 C.F.R. § 416.926a(d). To receive SSI benefits, a child recipient must also meet certain income and resource limitations. 20 C.F.R. §§ 416.1100, 416.1201.

A "marked" limitation is one which seriously interferes with functioning. 20 C.F.R. § 416.926a(e)(2)(i). "Marked" limitation means "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a(e)(2)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." *Id*.

An "extreme" limitation is one that "interferes very seriously with [a child's] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.926a(e)(3)(i). An

"extreme" limitation means "more than marked." 20 C.F.R. § 416.926a(e)(3)(i). "It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." *Id*.

If an impairment is found to meet, or qualify as the medical or functional equivalent to a listed disability and the twelve-month durational requirement is satisfied, the claimant will be deemed disabled. 20 C.F.R. § 416.924(d)(1).

### IV. Summary of Commissioner's Decision

The ALJ made the following findings regarding D.D. in the January, 2009, decision:

1. On June 12, 2006, the date the application was filed, he was a school-age child, and is currently a school-age child. (Tr. 11.)
2. He has not engaged in substantial gainful activity. *Id.*
3. He has severe impairments: ADHD and a learning disorder. *Id.*
4. He does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. *Id*.
5. He does not have an impairment or combination of impairments that functionally equals one of the listings. (Tr. 11-19.)
6. He has not been under a disability at any time since June 12, 2006. (Tr. 19.)

### V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v.*

*Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001)(*citing Mullen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the Commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

## VI. Analysis

Dumas challenges the decision of the Commissioner on the ground that finding D.D.'s impairments did not functionally equal a listing is unsupported by substantial evidence. Dumas contends the ALJ's finding that D.D. had a less-than-marked limitation in the domain of acquiring and using information is not consistent with the record. (Doc. No. 15 at 6.) This, in combination with D.D.'s marked limitation in the domain of attending and completing tasks, would cause his impairments to functionally equal the listings. *Id.* Specifically, Dumas argues that the ALJ relied solely on the results from the February 2006, testing done by the school, and ignored the rest of the school records as well as the test results from Dr. House. (Doc. No. 15 at 7-8.) The Commissioner responds that Dumas' argument overlooks the ALJ's findings, Dr.

8

House's conclusions, and the findings of Dr. Lewin. (Doc. No. 18 at 9.)

In the domain of acquiring and using information, the Regulations require the Commissioner to consider how well the claimant acquires or learns information, and how well the claimant uses the information he has learned. 20 C.F.R. § 416.926a(g). The Regulations also provide age-specific functions for this domain as follows:

> (iv) School-age children (age 6 to attainment of age 12). When you are old enough to go to elementary and middle school, you should be able to learn to read, write, and do math, and discuss history and science. You will need to use these skills in academic situations to demonstrate what you have learned; *e.g*., by reading about various subjects and producing oral and written projects, solving mathematical problems, taking achievement tests, doing group work and entering into class discussions. You will also need to use these skills in daily living situations at home and in the community (*e.g*., reading street signs, telling time, and making change). You should be able to use increasingly complex language (vocabulary and grammar) to share information and ideas with individuals or groups, by asking questions and express your own ideas, and by understanding and responding to the opinions of others.

20 C.F.R. 416.926a(g)(2)(iv).

> The ALJ relied on the following evidence to conclude D.D. was not disabled:
>
> After considering the evidence of record, I find that the claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; however, the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings for the reasons explained below.
>
> The claimant was diagnosed with attention deficit disorder and reading delay in 2006. It was noted that he should be started on 5 mg. of Adderall and it should be increased to 7.5 mg. (Ex. 1F). On August 29, 2006, the consultative examiner, David V. House, Ph.D., noted that the claimant was not given his medication on the date of the examination and that, based on behavioral observations, the claimant's diagnosis was not simply attention deficit disorder, but also attention deficit hyperactivity disorder. Dr. House also diagnosed the claimant with a learning disorder, not otherwise specified. (Ex. 16F). In October 2006, Susan Klein, M.D., pediatric neurologist, noted that the claimant was a little too sleepy on the 7.5 mg. dose and that the 5 mg. of Adderall seemed to be the perfect dose and that his school was happy. Dr. Klein also noted that the claimant's general physical and neurological examinations were normal and his behavior had improved. (Ex. 5F). On January 17, 2007, it was noted that the claimant was doing well on Adderall and there were no problems. On May 25, 2007, it was noted that the claimant had tried a higher dose of Adderall, but now was on 5 mg. and was happy with the medication and had no side effects to report. It was noted the claimant was well appearing, in no distress and was cooperative. On August 8, 2008, it was noted again that the claimant was doing well. (Ex. 15F.)
>
> Educational records from the Cleveland Municipal School District report that the

> claimant's Full Scale IQ Score is 96. It was noted that, based on this score, the claimant's overall cognitive ability is within the average range when compared to other students his age. (Ex. 13E.)

(Tr. 12-13.)

In addition, the ALJ assigned significant weight to the opinion of the state agency psychological consultant, Dr. Lewin, as follows:

> Insofar as it is consistent with the findings made below, I have assigned the opinion of the State Agency Psychological Consultant responsible for evaluating the impact that the claimant's impairments have on his ability to function significant weight in this case. After reviewing all of the evidence available at the time, Caroline Lewin, Ph.D., concluded on September 20, 2006, that the claimant's impairments did not meet, medically equal, or functionally equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P., Appendix 1. Specifically, Dr. Lewin found that the claimant's impairments resulted in: a less than marked limitation on his ability to acquire and use information; a marked limitation on his ability to attend and complete tasks; a less than marked limitation on his ability to interact and relate with others; a less than marked limitation on his ability to move about and manipulate objects, no limitation on his ability to care for himself; and no limitation on his health and physical well-being (Ex. 3F). While I recognize that these findings vary in only the domain of the ability to move about and manipulate objects from the findings made below, Dr. Lewin's conclusion that the claimant's impairments do not meet, medically equal or functionally equal a listed impairment is entirely consistent with the ultimate determination made in this decision (Ex. 7F). After reviewing the entire record, and noting that it is generally supported by the evidence contained therein, I have assigned Dr. Lewin's medical opinion significant weight in this case, insofar as it is consistent with the findings made below.

(Tr. 13.)

When considering D.D.'s ability to acquire and use information, the ALJ noted as follows:

> The claimant was given a Working Memory Index test in February 2006, which provides a measure of a child's ability to retain information in memory, perform some operation with it and produce a result. The claimant' score on this test was in the average range. (Ex. 13E).

(Tr. 14.)

Dumas argues that the ALJ relied solely on the one test score and ignored other relevant evidence demonstrating that D.D. has substantial problems in the domain of acquiring and using information. (Doc. No. 15 at 7.) Dumas further contends that the ALJ neglected to discuss some of the evidence of record showing that when D.D. was in second grade, testing revealed that there was a severe discrepancy between D.D.'s achievement and ability in reading

10

comprehension and mathematic calculation. *Id*. In addition, when D.D. was in fourth grade, test results indicate that he was reading at a grade two level, and word recognition was at a grade one level. *Id*. Dumas also argues that the ALJ failed to take into consideration test results from Dr. House indicating that D.D.'s word reading was at the tenth percentile, sentence completion at the third percentile, spelling at the second percentile, math computation at the nineteenth, and reading composite at the fourth percentile. *Id.*

The Commissioner contends that the Regulations permit the ALJ to rely on a test score as a factor in his decision. *See* 20 C.F.R. § 416.926a(e)(4)(iii)(B). (Doc. No. 18 at 9.) Moreover, the Commissioner argues that the ALJ discussed other relevant evidence, such as the psychologist's consultative examination, the pediatric neurologist's notes, and the state agency reviewer's opinion. (Doc. No. 18 at 10.) The Commissioner further maintains that the ALJ considered the full record when he gave Dr. Lewin's conclusions significant weight. Dr. Lewin reviewed Dr. House's report, including the full scale IQ of 86, which is in the low average to average range, and his observation that D.D. had "some learning difficulties," characterized as moderate. (Doc. No. 18 at 10.) Dr. Lewin concluded that this evidence supported some level of limitation in the domain of acquiring and using information, but only a less-than-marked level. *Id*. A second state agency reviewer corroborated her conclusions. *Id.*

Pursuant to the Regulations, test scores are to be considered as follows:

(i) As indicated in § 416.924a(a)(1)(ii), we will not rely on any test score alone. No single piece of information taken in isolation can establish "whether you have a "marked" or an "extreme" limitation in a domain.

(ii) We will consider your test scores together with the other information we have about your functioning, including reports of classroom performance and the observations of school personnel and others.

(A) We may find that you have a "marked" or "extreme" limitation when you have a test score that is slightly higher than the level provided in paragraph (e)(2) or (e)(3) of this section, if other information in your case record shows that your functioning in day-to-day activities is seriously or very seriously limited because of your impairment(s). For example, you may have IQ scores above the level in paragraph (e)(2),[2] but other evidence shows that your impairment(s)

---

[2]20 C.F.R. § 416.926a(e)(2)(iii) provides:

11

> causes you to function in school, home, and the community far below your expected level of functioning based on this score.
>
> * * *
>
> If there is a material inconsistency between your test scores and other information in your case record, we will try to resolve it. The interpretation of the test is primarily the responsibility of the psychologist or other professional who administered the test. But it is also our responsibility to ensure that the evidence in your case is complete and consistent, or that any material inconsistencies have been resolved.

20 C.F.R. § 416.926a(e)(4).

Even though the ALJ included only a reference to the Working Memory Index test results from 2006 when finding a less than marked limitation in the domain of acquiring and using information (Tr. 14), a fair reading of the entire opinion reveals that much more was considered. The ALJ acknowledged Dr. House's diagnosis. (Tr. 12.) In addition, the ALJ adequately discussed the reasons for assigning significant weight to Dr. Lewin's opinion. After reviewing the record before her, including Dr. House's findings and D.D.'s IEP, Dr. Lewin concluded that D.D. had a marked limitation in only the domain of attending and completing tasks. In finding a less than marked limitation in acquiring and using information, Dr. Lewin cited D.D.'s IEP showing he had not been placed in special education as well as Dr. House's I.Q. testing, showing D.D. to be in the low average range of functioning, and his conclusion that D.D. demonstrated some learning difficulties primarily in reading, sentence comprehension, and spelling. (Tr. 215 taken from Dr. House's report, Tr. 376-377.) The record also reflects that Dr. Casterline, a second state agency examiner, in a December 2006 evaluation found that D.D.'s WISC-IV scores were within the average range, and that he was improving with treatment. (Tr. 241-246.) Dr. Casterline concluded that D.D. had less than marked limitations in the domains of attending and completing tasks and acquiring and using information. *Id*. In fact, no professional found

---

> If you are a child of any age (birth to the attainment of age 18), we will find that you have a "marked" limitation when you have a valid score that is two standard deviations or more below the mean, but less than three standard deviations, on a comprehensive standardized test designed to measure ability or functioning in that domain, and your day-to-day functioning in domain-related activities is consistent with that score.

12

D.D. was marked in more than one domain, that of attending and completing tasks.

Although Dumas points to evidence that D.D.'s scores on achievement tests taken in early 2008 show that he was performing below the level expected based on his I.Q. score, there is ample evidence that D.D. was improving. In the IEP effective on February 1, 2008, when D.D. was in the fourth grade, the evaluator noted that D.D. had mastered four out of the five goals of his previous IEP. (Tr. 348-349.) The only goal not accomplished was D.D.'s ability to demonstrate the English language by reading books at "his independent reading level 3 to 4 times per week with at least 80% accuracy. . . ." (Tr. 348.) D.D., however, met his other goals, including his knowledge of multiplication facts, 89% accuracy; addition and subtraction, 80.3% accuracy; and writing, 75% accuracy. (Tr. 348-350.)

Moreover, in 2007, D.D.'s treating doctors, after examination, concluded that D.D. was doing well on his medication. (Tr. 365-368.) Lastly, the school interventionist noted that D.D. was responsive during small group instruction and completed his in-class assignments. (Tr. 170.) All things considered, substantial evidence supports the ALJ's conclusion that D.D. was not under a disability at any time since June 12, 2006.

### VII. Decision

For the foregoing reasons, the decision of the Commissioner is affirmed.

IT IS SO ORDERED.

                                                  s/ Greg White
                                          United States Magistrate Judge

Dated:  August 23, 2010